## Case No. 16,480.

### UNITED STATES v. The THOMAS SWAN.

[19 Law Rep. 201.]

District Court, D. South Carolina.   July 12, 1856.

STEAM VESSELS—SAFETY OF PASSENGERS—REGULATIONS—CARRIAGE OF SLAVES—INSPECTOR AS WITNESS.

1. The act of congress of August 30, 1852, c. 106, §§ 3–5 [10 Stat. 62], providing that vessels propelled by steam, and carrying passengers, shall be provided with certain pumps, life-preservers, &c., applies to a vessel so propelled which actually carries passengers, although not usually and regularly engaged in that business.

2. Negro slaves, shipped by their owner, are passengers, within the meaning of this act.

3. An inspector under this act, although he may be the informer, is not entitled to any part of the penalty (as he would have been under the act to which this is an addition), and is therefore not disqualified by interest from testifying in behalf of the libelants.

At law.

MAGRATH, District Judge. The questions which are raised in this case involve the consideration of certain portions of the act of congress, passed August 30, 1852, and also the act of congress passed July 7, 1838 [5 Stat. 304]. The object of both acts is to provide for the better security of the lives of passengers on board of vessels propelled in the whole or in part by steam. And the act of congress passed August 30, 1852, was evidently intended to embrace every provision which could be suggested as likely to assist in the accomplishment of an end so meritorious, and provide against the recurrence of accidents, so shocking as had been those which preceded, and induced its enactment. The 3d, 4th, and 5th sections of the act of 1852 are those of which, in this case, it is complained, there has been a violation. These sections provide that every vessel propelled by steam, and carrying passengers, shall have pumps of a certain description, to be placed in certain designated parts of the vessel, with suitable and well fitted hose attached to each; and pipes for the supply of these pumps passing through the sides of the vessel, so low as to be at all times in the water when the vessel is afloat; that every such vessel shall have at least two good and suitable boats, supplied with oars, one of which shall be a life boat, made of metal, fire proof, and in all respects a good substantial, safe sea boat, capable of sustaining inside and outside fifty persons; that every such vessel shall also have a good life-preserver, made of suitable material, or float, well adapted to the purpose, for each and every passenger, with buckets and axes. The steamer Thomas Swan, in the month of September, 1855, made a voyage from the port of Baltimore to the port of Charleston, having on board, according to her manifest, seven negroes belonging to Thomas Petigru. Those negroes, according to the receipt, were to be delivered to Robertson, Blacklock & Co., "paying the passage and other customary expenses, the danger of the sea and other casualties excepted." By a memorandum indorsed on this receipt, it is provided that the negroes in their transportation would be "at owner's risk of loss or injury." The libel charges that the steamer Thomas Swan is a vessel propelled by steam, carrying passengers, and has incurred the penalty provided in the act of congress, of 1852, because of the absence of the several provisions for the security of passengers, to which I have adverted.

On the part of the United States, Elias E. Hughes, an inspector under the act of 1852, was produced as a witness, and exception was taken to his competency on two grounds: (1) Because he was a party to the record; and (2) because he was interested in consequence of the act of July, 1838, to which the act of August, 1852, is an amendment, providing that the penalty in cases under it, shall be divided between the United States and the informer.

I have overruled the objection on both grounds. It is true, that the name of Elias E. Hughes is mentioned in the libel, but it is not necessarily there; is not connected with any part of the libel, and may have been altogether omitted. To the mention of his name, as it occurs in this libel, I attach no more consequence than, if this were an indictment for a misdemeanor, I would give to the fact, that the prosecutor's name was attached to the affidavit annexed to the warrant, and on which the indictment rested. It may be true that he gave the information, but this is not a prosecution in behalf of Elias E. Hughes, but of the United States. It is not the witness who asks the enforcement of the penalty, but the United States, whose laws are in this particular charged to have been violated. Nor am I able to find sufficient weight in the objection made to the witness on the score of interest, to exclude him on that ground. If I had come to the conclusion that the witness was entitled in case of conviction to the half of the penalty, I should even then have hesitated very long before I would, in sustaining the objection on that ground, defeat in a very great degree, if not altogether, the operation of this law. It is true that interest disqualifies, but it is also true that there are numerous cases in which, although the objection on the ground of interest is manifest, yet from ne-

cessity in such cases, the witness, although interested, is admitted to testify. The rule which applies to the admission of the testimony of an agent, although interested, is very familiar. I have not, however, any occasion to decide how far, in such a case as this, an informer who shares in the penalty is thereby rendered incompetent; because I do not perceive in what manner the interest of the witness is made to appear. It is true that the act of 1838 does provide, that the penalty declared in its provisions shall be divided, and one half shall be given to the informer. But I find no such provision in the act of 1852, and the questions raised in this case are really under the act of 1852. The act of 1852 declares, in the last section, that if a vessel is navigated without complying with the terms of this act (1852), the owners and the vessel shall be subject to the penalties contained in the 2d section of the act, to which this is an amendment—that is, the act of 1838. If I had to stop here, I should feel warranted in deciding that this declaration of the amount of the penalty to which the owner or vessel would be liable, by reference to another act, would not be the re-enactment of any division, which had been made, in such preceding act, of the penalty so to be enforced. But in fact the act of 1852 does not, in its subsequent provisions, leave room for argument on this branch of the question. By the 24th section, it is made the duty of the collectors, or other chief officers of the customs, and of the inspectors appointed under this act of 1852, to enforce the provisions of law against all steamers arriving and departing; and the omission of this duty, by such collector or other chief officer of the customs, or inspector, negligently or intentionally, subjects him to removal from office, and the penalty of one hundred dollars for each offence. The 33d section of the act of 1852, provides the compensation which shall be paid to the inspectors under this act; and the 37th section of the same act provides, that any inspector who shall, upon any pretence, receive any fee or reward for his services rendered under this act, except what is herein allowed to him, shall forfeit his office, and, if found guilty on indictment, be otherwise punished, according to the aggravation of the offence, by fine not exceeding five hundred dollars, or imprisonment not exceeding six months, or both. These provisions of the act of 1852 would seem not only to make it clear that the inspector is not entitled, by virtue of this act, to claim a share of the penalty; but that such inspector, if he should receive more than the compensation declared by the act, would be subject to the very heavy penalties therein declared.

The witness was then examined, and proved that in the case of the steamer Thomas Swan, he examined her at the time of her arrival in this port, in September, 1855; that there was a clear violation of the act of 1852,

in the omission to provide any of the articles set forth in the 3d, 4th and 5th sections of the act. The transportation of the negroes was proved by the testimony of Thomas H. Jervey, the deputy collector, who gave in evidence the admissions of the captain.

It was argued that the penalty did not attach, because the act of 1852 related to vessels propelled by steam and carrying passengers; and that in this case the steamer was not a vessel engaged in the business of carrying passengers; that the provision made for the security of passengers under the act of 1852, as appears by its numerous requisitions, was intended for such vessels as were employed in the business of transporting passengers, and was not intended for such as occasionally carried passengers. I can find nowhere in the letter of the act, nor in the mischief which the act was intended to relieve, any such exception as is contended for. The great object was to save human life; the means adopted were certain safeguards and precautions, which, in case of accident, would mitigate the horrors which attended the happening of those accidents then so frequent. I cannot consider that congress intended to say that these safeguards should be provided in certain vessels and not in others. It intended to protect human life, by these modes, so far as it could; and in all vessels which were subject to such accidents as these safeguards might avert, or at least mitigate in their consequences. Whenever a vessel propelled by steam, and therefore liable to these accidents, undertook to carry passengers, and, in doing so, exposed them to the dangers against which congress intended to provide, then, and in every such case, it was a vessel carrying passengers, within the letter and the mischief of the act, bound by all the provisions and subject to all the penalties which are expressed in the act. It is said that such a requisition on a vessel which does not generally carry passengers is oppressive. If it does so operate, the relief is very accessible—let it refuse to carry the passengers. But while it carries passengers, and receives hire for it, it must conform to such requisitions as are by law imposed on vessels propelled by steam with passengers on board.

It was further urged, that in this case the subjects of transportation were negroes; that they are recognized as chattels, and are not to be understood as included in that class described in the act of 1852 as passengers; that when transported they are taken as property; for them freight is paid, not passage money; that like other chattels they are under the protection of the owner, and congress has no right to legislate at all in relation to them.

When the argument is attempted to be strengthened by a reference to the difference between the term freight and passage money, as being in themselves sufficient to describe the subject to which they are applied, a significance is given to them much more important than is deserved. Freight, in the general legal sense of the term, means all reward,

hire or compensation paid for the use of ships. Abb. Shipp. (Story, Ed.). It adds to convenience in general use, to adopt the one term or the other, according to our wish to be understood as referring to persons or property. But we find numerous instances where freight of the person is the term used to designate the hire of the carriage of the person. I could not, therefore, if the fact was, as the argument assumes it to be, decide that negroes are not passengers under the act of 1852, merely because the hire of their carriage from the port of Baltimore was termed freight and not passage money. But it is not so. The receipt of the captain, produced in evidence, expresses the obligation of the owner to pay "the passage money and other necessary expenses." And did I give to the argument all the weight that is claimed, I should only, in so doing, provide the means for holding the owners to a contract, entirely different from that which they profess to have made. Although the negroes in this case were the property of an owner whose authority to hold, control, and dispose of them, is recognized and enforced by the laws of this state, I cannot perceive the inconsistency nor the impropriety, nor the interference which is said to be involved in extending to them all the protection that, in the act of 1852, is attempted to be provided against the carelessness or accidents of a carrier. Various laws provide in the case of the carrier for the security of property and life. But no rule of law, ever declared, which increases the security of property in the hands of a carrier, has been held to be an interference with the rights of the owner. His rights cannot be more fully recognized than in the multiplication of the securities which the law gives him for the protection of the property in which his rights are involved. It is said that the protection of the slave is committed to the master, and not to the congress of the United States. But the same thing may be said of any other chattel of which the owner is possessed. The rule of property in the case of the master and his slave is the same, unless limited in certain particulars, as I shall presently show, as is enforced in the case of a horse or a bale of goods. And to claim for a subject the incidents of property, including the right of ownership, is to affirm its right to such protection from laws made or to be made, as the legislative department of the government may deem proper. Indeed, it would be difficult to illustrate the fitness of this view more conclusively than by giving practical effect to the argument which is addressed to this part of the case by the respondent. Suppose that the act of 1852 contained an express provision that it should not be held applicable in any case where negroes should be the only persons carried. Would not such an enactment, as well on the ground of humanity as of right, be exposed to the severest censure? The owner would have an irresistible claim to a repeal of such legislation, as not only thus excluded his property from

the protection which, in other cases, it gave to human life, but in such exclusion, from its peculiar qualities, afforded it in fact less protection than it gave to a bale of merchandise. For, in addition to all such other qualities as are in a bale of goods as property, in the negro, as property, there is life,—the essence of the right itself. Refuse protection to that, without which the right of property is valueless, and the subject of property to which such refusal extends, is less protected than another piece of property, which does not require that protection.

Although, according to the law of South Carolina, the negro is the property of the owner, and a sale or transfer, voluntary or otherwise, is made in the manner and according to the form that is used in reference to a chattel; yet the law of South Carolina, in many particulars, distinguishes between the negro as the subject of property and any other chattel. The owner of a bale of goods may destroy it if he is pleased to do so; but the owner has no such right in relation to his negro. A cruel beating of a slave is an offence against the law of the state of South Carolina; and if the owner shall take the life of his slave, he may incur the same penalty that awaits him who takes the life of one of his own class. The law of South Carolina does not regard the ownership in all respects as absolute, but in a case of life, and even in a case of cruel beating, subordinate to the provisions just referred to. And in this, the law of the state, and the law of the United States concur; for they are both enacted for the protection of life, and its security from such dangers as result from malice or neglect. But it is not only in such cases as I have alluded to that a discrimination is made between the negro, as the subject of property, and any other chattel. The will, which in the negro operates as a motive of action, is recognized in all cases where its effects are developed, as materially qualifying the liability of those who otherwise would be held responsible. A carrier who would otherwise be liable for the loss of a negro, as he would be of any other chattel committed to his care, is relieved of such liability when the loss is made to appear as the consequence of the exercise of his will, on the part of the negro. And even in cases where the negligence of an agent who is charged with the care of negroes is established, but the proximate cause of the loss, although connected with such negligence, is to be referred to some direct exercise of the will, the agent has been relieved from liability; when in the case of any other chattel, the same negligence, resulting in loss, without the intervention of any quality like that of the will, breaking the immediate connection between the negligence and the loss, would have fixed his liability. It seems to me, then, quite clear that, although the negro is regarded, in law, as but a chattel, yet the discrimination recognized by the same law, between the negro and any other chattel, is sufficient

to bring him within the definition of a passenger. "Every person who pays a stipulated sum for his passage, or is on board in any shape, even free of charge, and has neither interest in the cargo nor belongs to the ship's crew, is a passenger." Jac. Sea Laws.

It is therefore ordered and decreed, that the respondents pay to the libellants the penalty of five hundred dollars, provided in the act of congress of August 30, 1852, with the costs of these proceedings.